139 So.2d 247 (1962)
J. PEREZ, S.A., Plaintiff and Appellee,
v.
LOUISIANA RICE GROWERS, INC., Defendant and Appellant.
No. 517.
Court of Appeal of Louisiana, Third Circuit.
March 8, 1962.
Rehearing Denied March 30, 1962.
Certiorari Denied April 30, 1962.
*248 Pugh, Buatt & Pugh, by Lawrence G. Pugh, Sr., and Lawrence G. Pugh, Jr., Crowley, for defendant and appellant.
Edmund M. Reggie, Crowley, for plaintiff and appellee.
Before SAVOY, CULPEPPER and HOOD, JJ.
HOOD, Judge.
Plaintiff, J. Perez, S.A., a Cuban corporation, instituted this suit against Louisiana Rice Growers, Inc., a Louisiana corporation domiciled at Crowley, Louisiana, for the sum of $21,568.65, plus legal interest and costs. As a basis for its demands plaintiff alleges that it purchased four different lots of rice from defendant during the year 1958, and that at the time those purchases were made defendant agreed to refund to plaintiff a part of the amount paid for said rice, the aggregate amount of these alleged refunds being the sum demanded in this suit. Plaintiff contends that it paid to defendant the full amount which it obligated itself to pay for the rice, but that the refunds which defendant agreed to make to plaintiff have not been paid, and that plaintiff accordingly is entitled to recover the amount of said refunds from defendant.
Defendant admits that it sold rice to plaintiff at the times alleged and that plaintiff has paid to it the amounts which it agreed to pay for the rice, but defendant denies that it agreed to refund to plaintiff any part of the purchase price. In the alternative, defendant alleges that if its manager agreed to make any such refund to plaintiff, such an agreement was made without the knowledge or consent of the officers of defendant corporation, and that his actions in that respect were ultra vires, fraudulent, null and void and of no effect.
The defendant filed an exception of no cause and no right of action, which was overruled. It then filed an answer, and in due course the case was tried on its merits. Judgment was rendered by the trial court in favor of plaintiff and against defendant for the full amount claimed, and defendant has appealed from that judgment.
Defendant contends primarily that the trial court erred in overruling the exception *249 of no cause and no right of action. As one ground for this exception, defendant contends that the plaintiff corporation was doing business within the State of Louisiana at the time this suit was filed, but that it had not complied with the laws of this State for doing so, and that it accordingly is prohibited by LSA-R.S. 12:211 from maintaining this action in a Louisiana court. The evidence shows that although plaintiff purchased considerable quantities of rice from Louisiana rice mills, yet it maintained no office, warehouse or place of business in this State, and it had no officers, agents or employees located in the State of Louisiana.
Whether or not a foreign corporation is, in legal contemplation, doing business in Louisiana is a mixed question of both law and fact which must be determined on the basis of the particular facts relating to its operations. Quaker Hill, Inc. v. Guin, La.App. 2 Cir., 95 So.2d 370; Equitable Discount Corporation v. Dickinson, La.App. 2 Cir., 106 So.2d 800; J. R. Watkins Co. v. Floyd, La.App. 1 Cir., 119 So.2d 164. In our opinion the purchase of goods within the State by a foreign corporation, even if occurring at regular intervals, will not in and of itself justify the conclusion that the corporation is doing business within the State. See 12 A.L.R.2d 1439 and 1445; Reynolds Metal Co. v. T. L. James and Co., La.App.Orl., 69 So.2d 630; Quaker Hill, Inc. v. Guin, supra; R. J. Brown Co. v. Grosjean, 189 La. 778, 180 So. 634, 635. Under the facts presented here, we conclude that plaintiff was not doing business within the State of Louisiana, and that it accordingly is not prohibited under the provisions of LSA-R.S. 12:211 from maintaining this action.
Defendant further alleges as a basis for its exception of no right or cause of action that plaintiff did not allege in its petition that "defendant did actually receive the fair market price for its rice after paying the kick back money." No authorities have been cited to support the argument that defendant is entitled to receive the fair market price for its rice, regardless of the amount which it agreed to accept under the contract, and we know of no such authority. It is not essential to plaintiff's case that it prove that defendant received the fair market price for its rice, and accordingly it was not necessary for plaintiff to include allegations to that effect in order for his petition to state a cause of action.
In our opinion, the trial court correctly overruled the exception of no cause and no right of action filed by defendant.
The evidence establishes that during the early part of the year 1958 plaintiff agreed to buy from defendant and that defendant, through its general manager, agreed to sell to plaintiff four lots of rice. These rice sales were negotiated through a brokerage firm known as Commerce Brokerage and Storage Company, a Louisiana corporation domiciled in Crowley. Lance McBride was then the general manager of defendant corporation and he was also the president of and a stockholder in this brokerage firm. All of the negotiations for the sale of this rice were between Gustavo Perez, representing the plaintiff corporation, and Lance McBride, representing the brokerage firm and defendant corporation. At the time the sale of these lots of rice were negotiated, written contracts, or agreements confirming the sales, were entered into between plaintiff, on the one hand, and Commerce Brokerage and Storage Company, on the other. All of the contracts relating to the sale of these four lots of rice were then assigned by Commerce Brokerage and Storage Company to defendant, and defendant thereupon delivered the rice to plaintiff and received payment of the purchase price from plaintiff.
The evidence further shows, however, that two separate written contracts, or agreements confirming the sale, were executed by plaintiff and Commerce Brokerage and Storage Company in connection with the sale of each of the four lots of rice. The two contracts relating to the sale of each of these lots of rice were identical in every *250 way, except that the price to be paid for the rice was different in each of the two contracts, and one of the contracts provided for a refund to plaintiff while the other did not. Plaintiff relies upon the four contracts which provide for a refund of a part of the purchase price to plaintiff, which contracts we will refer to as the "refund contracts." Defendant relies upon the other set of contracts which do not provide for any such refund, and which contracts we will refer to as the "no-refund contracts." Plaintiff contends that the refund contracts reflect the true intent and agreement of the parties, while defendant contends that the no-refund contracts show the actual agreement of the parties with reference to these sales.
The first set of contracts between plaintiff and Commerce Brokerage and Storage Company, being the "refund contracts" upon which plaintiff relies, are described as follows:
(1) Contract No. 8-58, dated February 26, 1958, for 4,901 pockets of rice, at a price of $9.85 per hundred pounds net, C.I.F. Havana, Cuba, accompanied by a "letter of credit" for $10.50 per hundred pounds net. The contract provides that "Buyers will open the corresponding letter of credit covering a buying price of U.S. $10.50 per 100 pounds net. Sellers must send the difference in excess to Messrs/ J. Perez, S.A., Paula No. 51, Havana, Cuba." The difference in price between the contract and the letter of credit, being 65¢ per pocket, amounted to the sum of $3,185.65.
(2) Contract No. 9-58, dated February 26, 1958, for 1,500 pockets of rice at a price of $9.85 per hundred pounds net, C.I.F. Havana, Cuba, accompanied by a letter of credit for $10.50 per hundred pounds net. This contract contained the same provision as that contained in the one hereinabove described to the effect that the difference between the price provided for in the contract and that shown in the letter of credit was to be sent to plaintiff. This difference in price, being 65¢ per pocket, amounted to $975.00.
(3) Contract No. 7-58, dated February 26, 1958, for 2,000 pockets of rice, at a price of $12.00 per hundred pounds net, C.I.F. Havana, Cuba, accompanied by a letter of credit for $12.50 per hundred pounds net. This contract also contained identical provisions providing that the difference in price was to be sent to plaintiff. In this instance the difference in price between the letter of credit and the contract, being 50¢ per pocket, amounted to $1,000.00.
(4) Contract No. 11-58, dated March 24, 1958, for 8,204 pockets of rice, at a price of $8.70 per hundred pounds net, C.I.F. Havana, Cuba, accompanied by a letter of credit for $10.70 per hundred pounds net. This contract also provided that the difference in price was to be sent to plaintiff. In this instance the difference in price being $2.00 per pocket, amounted to $16,408.00.
Each of the four agreements comprising the second set of contracts, being the "no-refund contracts" upon which defendant relies, contains the same identification number, bears the same date, and provides for the sale of the same quantity and type of rice (except in one instance) as is shown in the corresponding refund contract, but each of the no-refund contracts provides that the price to be paid for the rice therein described is the same as that shown in the letter of credit attached to the agreement, and there is no provision to the effect that the "difference in excess" is to be sent to plaintiff. We note that refund contract no. 11-58 provides for the sale of a different grade of rice than that shown in no-refund contract no. 11-58. The refund contract bearing that number provides for the sale of "U.S. No. 3 or better, Blue Bonnet Rice," while the corresponding no-refund contract bearing the same number provides for "U.S. No. 4 or better, Blue Bonnet Rice." The evidence establishes that both of these contracts *251 refer to the same lot of rice, however, and we attach no significance to the fact that one describes a different grade of rice from that described in the other.
In contract no. 8-58 and contract no. 9-58, both dated February 26, 1958, plaintiff actually paid and defendant received $10.50 per hundred pounds net, C.I.F. Havana, Cuba, which was the price specified in the no-refund contracts relating to those sales. The other set of contracts relating to the same sales provided that a price of $9.85 per hundred pounds net, C.I.F. Havana, Cuba, was to be paid, and that the difference between that price and the amount of the letters of credit ($10.50 per 100 pounds net) was to be refunded to plaintiff. Under contract no. 7-58 defendant received a price of $12.50 per pocket, and under contract no. 11-58 it received $10.70 per pocket, which are the prices shown in the no-refund contracts for those sales, but are higher than the prices shown in the corresponding contracts relating to the same sales and which provide for refunds to plaintiff.
At the time these transactions took place, Maple Hughes was the president of defendant corporation, and Lance McBride was its general manager. As has already been stated, Mr. McBride also was the president of Commerce Brokerage and Storage Company, the brokerage firm which negotiated these sales to plaintiff. Mr. Hughes became ill shortly after these transactions occurred, and he has become so incapacitated that he was unable to testify at the trial. None of the directors of the defendant corporation, other than the president Maple Hughes, had any knowledge of the exact nature of the agreements which had been entered into with plaintiff relative to these sales. Mr. McBride was discharged as manager of defendant corporation in May, 1958, after these transactions had been completed. Defendant contends that he was discharged because he was responsible for a serious deterioration in the financial and business affairs of the defendant corporation, and it appears from the record that there was some animosity between McBride and the directors of defendant corporation.
McBride testified that the refund contracts, or those providing for a rebate of a portion of the purchase price to plaintiff, showed the actual agreements which he, as general manager of defendant corporation, had entered into with plaintiff relative to these rice sales. He explained that in making sales of rice to be shipped to Cuba it was a common practice for rice mills in the Crowley area to accept letters of credit for more than the agreed price and to refund to the purchaser that part of the amount paid which was in excess of the agreed purchase price. The evidence corroborates his testimony to that effect. It, in fact, shows that the defendant mill had made a number of sales previously to plaintiff under the same type of agreement, and pursuant thereto had made refunds to the purchaser, and that other mills in that area had done the same thing.
McBride further explained that, although the refund contract expressed the actual agreement which had been entered into between the parties in a particular sale, the no-refund contract relating to the same sale was executed by the parties for the following reasons: (1) The banks would not honor the letter of credit which accompanied each contract unless the price shown on the contract corresponded with the price shown on the letter of credit; and (2) the Cuban Consul would not approve or permit exportation of the rice to Cuba unless the price shown in the contract and the price stated in the attached letter of credit was the same.
The evidence shows that all four of the no-refund contracts were filed with the Cuban Consul and that visas were granted by him for exportation of the rice described in those documents. Also, the evidence shows that in order for the rice to be shipped it was necessary for a Shipper's Export Declaration to be signed by the shipper, as required by regulations adopted pursuant to the Export Control Act of 1949 (50 U.S. *252 C.A. Appendix, § 2021 et seq.). Such a declaration was signed in connection with the exportation of each of these four lots of rice, and in each such declaration the selling price shown was the same as that reflected in the no-refund contract. Counsel for defendant points out that it is a violation of the law to make a false representation in one of these export declarations. See 18 U.S.C.A. § 1001. In each of these export declarations, however, Commerce Brokerage and Storage Company is shown as the "Exporter," and H. S. Thielen, Inc., as its agent. Each such declaration was signed by a representative of H. S. Thielen, Inc., and no where does it appear that an employer, officer or agent of either plaintiff or defendant signed it.
Defendant contends primarily that the trial court erred in holding that defendant agreed to refund or to "kick back" to plaintiff that portion of the amount paid for each lot of rice which was in excess of the price shown in the refund contract. We think the evidence supports the conclusion reached by the trial court on that issue, and that the "refund contracts" reflected the true agreements which were entered into between plaintiff and defendant relative to the sale of these lots of rice. We, like the trial judge, are convinced that McBride, as the general manager of defendant corporation, agreed to refund to plaintiff the difference between the amount shown on the letter of credit and the price shown in the refund contract in each of the four rice sales involved here.
Defendant, in the alternative, contends that McBride acted beyond the scope of his authority in agreeing to make these refunds or rebates to plaintiff. It is conceded that he, as the general manager, had the authority to make sales of rice in behalf of the corporation, but defendant maintains that he had no authority, actual or apparent, to refund to a purchaser any part of the purchase price paid for rice. The authority to negotiate and complete sales of rice in behalf of the corporation includes the authority to agree upon a purchase price for such rice. In this case McBride did agree with plaintiff on a purchase price for the rice, and we think he acted within the scope of his authority, as general manager of defendant's mill, to agree to refund to plaintiff all amounts paid for the rice which were in excess of the agreed purchase price.
Assuming, however, that McBride had not been authorized by defendant's Board of Directors to make refunds such as those which he agreed to make to plaintiff in this case, we think defendant is bound by his agreement to do so here because McBride had been given the apparent authority to do so. The articles of incorporation of defendant provide that one of the purposes of the corporation is "marketing rough rice and the products and by-produces produced there from." The charter is silent as to the authority of the general manager, but the by-laws provide that the Board of Directors has control and supervision of the business and affairs of the corporation, and that the board has the power to employ a manager who "shall have charge of the business of the association under the direction of the Board of Directors." McBride was employed as general manager of defendant's mill in 1954, and the evidence does not show that his authority to administer its affairs was ever limited or restricted in any manner from that time until he was discharged after these sales had been completed.
The evidence is uncontradicted to the effect that McBride, as general manager, had negotiated many sales of rice in behalf of the corporation prior to the time these transactions occurred, and that he had entered into and had executed a number of agreements identical in nature to those on which this suit is based. Maple Hughes, president of the corporation, apparently knew of this practice in making sales to Cuban buyers, but the other members of the Board of Directors were not aware of it. The evidence shows, however, that Joe Voorhies, who was employed in the clean rice sales office of defendant corporation, and Miss Margaret Killmer, the bookkeeper, were aware of the *253 details of these and other similar rice sales to plaintiff, including the refunds made to it. Miss Killmer testified that she computed the amounts of the refunds due plaintiff in connection with prior sales and then typed out checks for those refunds. Voorhies testified that he customarily made entries or notations on the shipping orders showing the refunds due plaintiff in prior sales of rice, and that these notations were made in order that the bookkeeping department could compute the amount due and see that the refunds were paid. A number of checks from defendant to plaintiff, representing refunds from prior rice sales, were signed by Mr. Hoffpauir, who was then defendant's bookkeeper. The evidence further shows that checks representing the refunds due on the four checks with which we are now concerned had been made out by employees of the defendant corporation prior to the time Mr. McBride was discharged as manager, but that these checks have never been delivered to plaintiff. Although it appears that the directors of defendant corporation were not aware of the manner in which these sales to plaintiff were carried out, the evidence convinces us that there was no scheme or intent on the part of McBride to conceal the facts relating to these sales from the directors.
The law is settled to the effect that when in the usual course of business of a corporation an officer has been allowed to manage its affairs, his authority to represent the corporation may be implied from the manner in which he had been permitted to transact its business, and the corporation is responsible for the acts of that officer within the apparent authority conferred upon him. Slagle v. Peyton, 182 La. 353, 162 So. 12; Morgan v. Cedar Grove Ice Co., Inc., 215 La. 741, 41 So.2d 521; Ideal Savings and Homestead Ass'n v. Kerner, 208 La. 513, 23 So.2d 200; J. P. Barnett Co. v. Ludeau, 171 La. 21, 129 So. 655; Harris v. H. C. Talton Wholesale Grocery Co., 2 Cir., 11 La.App. 331, 123 So. 480; Mayville Canal Co. v. Lake Arthur Rice Milling Co., 119 La. 447, 44 So. 260; Russ v. United Farm Equipment Co., 230 La. 889, 89 So.2d 380.
In our opinion, McBride, as the manager of defendant's mill, had the actual and apparent authority to enter into agreements in behalf of the corporation for the sale of rice, and in that connection he had the actual and apparent authority to bind the corporation to refund to the purchaser that portion of the amount paid for the rice which was in excess of the agreed purchase price. We find, therefore, that he was acting within the scope of his authority in agreeing to make the refunds which are here at issue to plaintiff.
Defendant contends further that plaintiff's demands should be rejected because the agreement to refund to plaintiff a portion of the amount paid for these lots of rice was fraudulent, illegal, null and void and against the public policy of the State of Louisiana. We agree with counsel for defendant that a contract is unenforceable by either party if it is prohibited by law, or if it is contrary to good morals or public order. The law presumes, however, that persons in their business transactions do not intend to violate the law or to enter into a contract for the enforcement of which the law refuses a remedy. For that reason when one party charges that the contract is confected with an illegal intent or that it is contrary to good morals or public order, the burden of proof rests upon him to establish that allegation. Baucum & Kimball v. Garrett Mercantile Co., 188 La. 728, 178 So. 256; Stewart Bros. v. Beeson, 177 La. 543, 148 So. 703; 8 T.L.R. 184, 188.
The trial court held, correctly we think, that "there is absolutely no showing of any fraud between him (McBride) and plaintiff." The fact that plaintiff and defendant's assignor entered into two contracts relating to the same sale, each stipulating a different price, presents a problem in determining the true intent of the parties, but we know of no law which renders the agreement illegal or null and void because of that circumstance alone. Counsel for defendant contends, however, that the representations made by the shipper in filing *254 the no-refund contracts with the Cuban Consul and the representations made in the Shipper's Export Declaration are not true, and that these false representations render the refund contracts null and void, contrary to public policy and unenforceable by either party. It is argued that "if there was an agreement to refund a part of the purchase price, the failure of the parties to make that agreement known either to the Cuban Consul or to the United States Department of Commerce resulted in the illegality of the alleged agreements," and that, "it is well established that an illegal contract cannot be enforced by either party."
The evidence fails to show, however, that plaintiff, or any of its agents or employees, participated in obtaining the approval of the contracts and the issuance of visas by the Cuban Consul, or in filing the Shipper's Export Declaration. It is true that plaintiff executed both the refund and the no-refund contracts, and it could be argued with some logic that plaintiff's agents thereby became parties to the alleged misrepresentations. The evidence shows, however, that one of the purposes of executing the no-refund contracts was to enable the seller to obtain payment under the letters of credit, and counsel have referred us to no law which prohibits such a thing. There was a logical reason and a lawful purpose for plaintiff to execute both sets of contracts, therefore, and we will not presume that it executed them for an illegal purpose in the absence of any proof to that effect. If there were any misrepresentations of fact to the Cuban Consul or to the United States Department of Commerce, therefore, we agree with the trial court in his conclusion that the evidence fails to show that plaintiff was a party to them. Plaintiff accordingly is not barred from recovery on that ground.
Further, in the alternative, defendant contends that plaintiff is not entitled to recover under contract no. 11-58, dated March 24, 1958, because the refund contract was not properly produced and filed in evidence by plaintiff. The record shows that prior to the trial of this case and upon application of defendant, the court ordered plaintiff to produce in court, among other documents, the four contracts upon which plaintiff's demands are based. Pursuant to this order, counsel for plaintiff produced and filed in evidence four contracts which were identified in the pleading filed by plaintiff as contracts no. 7-58, no. 8-58, no. 9-58 and no. 11-58. Inadvertently, however, the clerk received two copies of contract no. 7-58, but did not receive a copy of contract no. 11-58. Later at the trial of the case on its merits, plaintiff again offered contract no. 11-58 in evidence, although the record does not indicate whether the court admitted it or refused to admit it in evidence. A few weeks after the trial was completed, and in response to a rule issued on application of plaintiff, another hearing was held, at which time counsel for plaintiff testified that refund contract no. 11-58 had actually been produced and filed in response to the prior order of court. His testimony to that effect was supported by the testimony of three other attorneys who were in court at that time. At the conclusion of that hearing the Court ordered that refund contract no. 11-58 be filed in the record.
Defendant contends that plaintiff's failure to file this contract in evidence, when ordered to do so prior to the trial, precluded it from recovery on that contract. He cites as authority for that contention Articles 174 and 175 of the Code of Practice, LSA-R.S. 13:3792, and Maillon's Estate v. Boyce, 14 La.Ann. 621.
We think the evidence shows clearly that contract no. 11-58 was produced by plaintiff in response to the order of the trial court, and that after being so produced in open court another document was inadvertently handed to the clerk in its stead. Refund contract no. 11-58 was clearly described in plaintiff's petition and in the pleading which plaintiff filed at the time all four contracts were produced in response *255 to the order of court. In both of those pleadings, that part of the contract which provided that a refund should be made to plaintiff was quoted verbatim as a part of the description of the document. We are convinced that since the contract was actually produced and was clearly described in the pleadings, defendant was not prejudiced in any way by the inadvertent error which was made in handing the wrong document to the clerk prior to the trial. In our opinion, the trial court correctly permitted refund contract no. 11-58 to be filed and incorporated into the record.
After the case had been tried, but before judgment was rendered, defendant filed a motion alleging that plaintiff is a Cuban corporation, and that the court may take judicial notice of the following facts:
"a. The United States of America has broken diplomatic relations with the Republic of Cuba;
"b. The Republic of Cuba is actually a dictatorship under the control of one Fidel Castro, and is now communistic;
"c. Cuba is now an ally and a satellite of the U.S.S.R., a communistic country engaged in a `cold war' with the United States."
On the basis of those allegations defendant demanded that the suit be dismissed at plaintiff's costs, or, in the alternative, that the proceedings be stayed until further orders of the court. The court denied the relief which defendant sought by that motion, and defendant contends that the court erred in doing so.
The evidence shows nothing of a break in diplomatic relations between the United States and Cuba, because such a break had not occurred at the time of the trial. We will not consider the question of whether we should take judicial notice of the facts alleged in this motion, but will simply assume that all of the alleged facts are true. We note that according to the allegations in the motion the United States is not at war with Cuba or the U.S.S.R., and that plaintiff is not an "enemy" or an "ally of enemy," as defined in the Trading With the Enemy Act (50 U.S.C.A.Appendix, § 1 et seq.).
Defendant relies on the case of Pilcher v. Dezso, 262 Ala. 249, 78 So.2d 306, which was decided by the Supreme Court of Alabama in 1955. In that case the plaintiffs, who were Hungarians, instituted suit to set aside a deed executed by the executor of the decedent's estate affecting lands in Alabama, and to have the land sold for division among the next of kin of the decedent. The defendant filed a demurrer contending that plaintiffs were enemy aliens of the United States and that as such they had no legal or equitable standing in the courts of that state. The pleadings showed that the complainants were residents of Hungary, which was a satellite state of the Soviet Group, and that that country was engaged in a "cold war" with the United States. The court overruled the demurrer, holding that plaintiffs were entitled to maintain an action in the courts of Alabama to establish their title to the lands there in dispute, and that the issue of the distribution of the proceeds of the sale would be determined when the case reached that stage, if it ever did. The opinion of the court contained dictum to the effect that the distribution of the proceeds of the sale to the residents of Hungary might not be permitted under the circumstances shown there. In spite of the dictum to that effect, however, the court specifically held that plaintiffs in that case were entitled to maintain the action which they had instituted in the courts of that state, and we do not think the cited case can serve as authority for defendant's motion to dismiss or to stay these proceedings.
We agree with the Supreme Court of Alabama that an "alien enemy" will not be permitted to obtain a judgment in the courts of this State and thereby add to the resources of the power of which he is subject. *256 Lutz v. Van Heynigen Brokerage Co., 202 Ala. 234, 80 So. 72; Pilcher v. Dezso, supra. In this case, however, since defendant has not alleged that a state of war exists between the United States, on the one hand, and Cuba or the U.S.S.R., on the other, the motion does not set out facts which would justify a conclusion that plaintiff is an "alien enemy" or an "enemy" or an "ally of enemy," sufficient to justify the dismissal of this suit or a stay of these proceedings. The question of whether the funds due plaintiff under the judgment rendered in this suit should be impounded, as apparently has been done in some other jurisdictions, is not now before us. See authorities cited in Pilcher v. Dezso, supra.
For the reasons herein set out, the judgment of the district court is affirmed. All costs of this appeal are assessed to defendant-appellant.
Affirmed.

On Application for Rehearing.
En Banc. Rehearing denied.